**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| LISA COCCIOLILLO, *individually, and on behalf of others similarly situated,*<br><br>     Plaintiff,<br>   v.<br><br>SMARTMATCH INSURANCE AGENCY, LLC,<br><br>     Defendant. | Case No.: 4:24-cv-00627-SRB<br><br><br><br>**Jury Trial Demanded**<br><br>**First Amended Complaint – Class Action** |

**FIRST AMENDED CLASS ACTION COMPLAINT[1]**

COMES NOW Plaintiff Lisa Cocciolillo ("Plaintiff"), individually, and on behalf of all others similarly situated, and for her Class Action Complaint against Defendant SmartMatch Insurance Agency, LLC ("Defendant"), states:

**BACKGROUND**

1.      This case is about stopping incessant telemarketers like Defendant from placing unwanted and unsolicited calls to the phones of Plaintiff and likely thousands of other persons.

2.      Plaintiff brings this class action lawsuit against Defendant for placing improper telephone solicitation calls in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), and the TCPA's corresponding regulations.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendant's counsel has given written consent to Plaintiff's counsel to file the First Amended Complaint.  Plaintiff's counsel consents to providing Defendant's counsel until January 22, 2026, rather than 14 days prescribed for under Rule 15(a)(3) to respond to the amended complaint.  This filing is also timely in accordance with the operative scheduling order.

3.     In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law, to protect consumers' privacy and the right to be left alone from unwanted telemarketing communications.

4.     A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

5.     Defendant placed or had placed on its behalf telephone solicitation calls to Plaintiff and the putative class members despite Plaintiff's and the putative class members' phone numbers being registered on the National Do-Not-Call Registry ("DNC List").

6.     These calls also utilized artificial or prerecorded voice technology in an effort to screen calls *en masse* for individuals Defendant wanted to target with their Medicare-related products and services.

7.     Defendant further placed or had placed on its behalf telephone solicitation calls to Plaintiff and the putative class members despite Plaintiff and the putative class members requesting that Defendant or those acting on Defendant's behalf stop calling them (*i.e.* to be placed on Defendant's internal Do-Not-Call List).

8.     Telemarketing calls are rampant in this country. In the first eleven months of 2025 alone, approximately 48.4 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Dec. 22, 2025). The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing communications. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019,

https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

9.      Plaintiff seeks to represent putative class members who received two or more telephone solicitation calls within a 12-month period from or on behalf of Defendant after previously registering their numbers on the DNC List and/or persons who received two or more such calls within a 12-month period after requesting that Defendant or those acting on its behalf stop calling them.

10.      Plaintiff also seeks to represent putative class members who received calls that utilized an artificial or prerecorded voice from or on behalf of Defendant on their cellular telephones without prior express consent.

## PARTIES AND BACKGROUND ON THE PARTIES

11.      Plaintiff is an individual who at all times material to this Complaint has resided in and has been a citizen of the State of New Jersey

12.      Defendant is a Missouri limited liability company and has been in good standing to transact business in the State of Missouri and throughout the United States at all times material to this Complaint.

13.      Defendant's principal place of business is in Kansas City, Missouri.

14.      Defendant is a company that sells insurance products and services (including Medicare products) through telemarketing phone calls.

15.      According to Defendant's filings with the Missouri Secretary of State website, Defendant's business purpose is the "distribution of senior insurance products."

16.      Defendant's website is www.smartmatch.com.

3

17.     Defendant's website states that Defendant "can help you compare a variety of the Medicare products available in your area. Then our technology connects you with a licensed insurance agent best suited to help you with your specific situation. The only thing you need to decide is which plan is best for you."

18.     Defendant's website states that, "We partner with a variety of insurance carriers to help ensure you are confident in choosing a policy that meets your needs at a price that fits your budget."

19.     Defendant's website states, "This is a solicitation for insurance. . . . SmartMatch Insurance Agency and its divisions are licensed to sell insurance products in all 50 states and DC."

20.     Defendant markets its products and services, in part, through telemarketing. This includes placing telemarketing phone calls placed directly to consumers and/or having such calls placed on its behalf by its vendors Fluent, LLC and Digital Media Solutions, LLC and its/their sub-vendors.

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

22.     This Court has jurisdiction over Defendant because, among other things, Defendant: is a Missouri limited liability company, has its principal place of business in Missouri, transacts business in Missouri, purposefully directed its marketing efforts to Plaintiff from Missouri, and otherwise has sufficient contacts with the State of Missouri.

4

23.     For those reasons, and as set forth generally in this Complaint, this Court has personal jurisdiction over the parties to this action, and venue is proper pursuant to 28 U.S.C. §1391(b)(2).

## DEFENDANT'S TELEMARKETING CAMPAIGNS

24.     Defendant's parent company, Spring Venture Group, LLC ("SVG") entered into a Lead Purchase Master Services Agreement and various Statements of Work/Insertion Orders with Fluent, LLC ("Fluent") on behalf of Defendant.

25.     Defendant's parent company, SVG, also entered into a Lead Purchase Master Services Agreement and various Statements of Work/Insertion Orders with Digital Media Solutions, LLC ("DMS").

26.     Pursuant to these Agreements, Fluent and DMS would provide Defendant with consumer data, or transfer leads, meeting the requirements specified and set by Defendant.

27.     Defendant provided daily/weekly volume targets to Fluent and DMS for the number of transfer leads Defendant would accept and desired from Fluent and DMS.

28.     Defendant profited off the transfer leads provided by DMS and/or Fluent as some of these leads resulted in the sale of Defendant's Medicare-related products and services.

29.     Defendant retained the right, and exercised the right, to approve creatives, scripts used by Fluent's and DMS' telemarketers, and the forms used by Fluent and DMS to obtain leads to be sent to Defendant.

30.     The agreements between Defendant and Fluent and DMS, required Defendant's approval of creative (which included websites), scripts and forms.

5

31.     Defendant retained the right, and exercised the right, to approve the websites, including the domain names, in which Fluent and DMS were authorized to procure leads on Defendant's behalf.

32.     Defendant retained the right, and exercised the right, to control and approve the specific language used by Fluent and DMS on its websites that Fluent and DMS purportedly used to obtain leads and/or procure consumer information.

33.     Upon information and belief, Fluent and DMS procured leads for or on behalf of Defendant via unsolicited telephone calls to consumers.

34.     Upon information and belief, Fluent and DMS would claim that the telephone numbers they were calling were generated from insurance related websites where consumers would enter their information in a way that would make clear and conspicuous that they were seeking out and wanted information related to insurance products.

35.     Defendant knew this was not the case, as Defendant would approve the websites Fluent and DMS were allegedly using, including the domain names.

36.     Fluent and DMS would use confusing websites that had nothing to do with insurance to claim they obtained consent for the phone calls they were placing on Defendant's behalf.

37.     For example, Fluent and DMS would use third-party "jobs" websites that would purport to have users enter information to receive information about job openings.

38.     In reality, these websites were not legitimate and did not source job listings or provide any legitimate jobs listings to any consumers.

39.     These websites were used to obtain consumer information or attribute consent to make telemarketing calls to consumer information in a way that would allow Fluent and DMS to

6

call telephone numbers on behalf of numerous companies, including Defendant for products that had nothing to do with purpose of the website.

40.     Fluent and DMS would also use "rewards" websites, "sweepstakes" websites, and/or free product or sample websites to claim they had consent to call leads on behalf of Defendant for insurance products.

41.     Defendant knew, or should have known, that the "consents" Fluent and DMS used were invalid, as Defendant approved of the websites and language Fluent and DMS claimed to have been using to obtain consent.

42.     Defendant knew, or should have known, that Fluent and DMS used various levels of screening during the unsolicited calls they made in an attempt to weed out consumers that clearly had no interest in insurance or that would complain about the illegal calls.

43.     Defendant knew and approved of Fluent and DMS using vague and fictious names during the unsolicited phone calls to avoid their illegal campaign being uncovered.

44.     Defendant knew and approved of Fluent and DMS spoofing telephone numbers to place calls to consumers so that the calls could not be easily traced or attributed to any company.

45.     In many instances, Fluent and DMS would use prerecorded or artificial voice calls to first screen for individuals that met the criteria provided by Defendant.

46.     When the system used by Fluent and/or DMS would identify an individual that met Defendant's criteria, based on their interaction with the prerecorded or artificial voice prompts, Fluent and/or DMS would transfer the call to a live person to screen the call before Fluent and/or DMS would transfer the call to Defendant.

47.     Defendant was aware of and approved of Fluent's and DMS' telemarketing practices.

48. Defendant had access to, and accessed, telephone call recordings placed by Fluent and DMS.

49. Defendant listened to the telephone call recordings placed by Fluent and DMS and provided feedback to Fluent and DMS.

50. Defendant has the right to audit, and exercised its right to audit, calls placed by Fluent and DMS, pursuant to its agreements with Fluent and DMS.

51. Defendant knew that its scheme violated the TCPA and took affirmative steps to decrease the likelihood that Defendant would be caught violating the law. For example, Defendant and/or Fluent and DMS subscribed to databases to identify telephone numbers associated with Telephone Consumer Protection Act lawyers and individuals that had previously made complaints about unwanted or illegal calls.

52. Defendant would use this information to terminate calls before Defendant's identity would be revealed during the call progression.

## DEFENDANT'S PHONE CALLS TO PLAINTIFF AND OTHERS

53. At all times relevant to this Complaint, Plaintiff was the owner of a cellular telephone bearing the phone number 609-XXX-6390.

54. Plaintiff placed her phone number was placed on the national Do Not Call Registry ("DNC List") on March 27, 2007, for the purpose of being left alone by telemarketers.

55. The account for Plaintiff's phone is not held in the name of a business.

56. Plaintiff uses her phone primarily for personal and household purposes, including communicating with friends and family members.

57. Plaintiff did not inquire of Defendant's services or request Defendant's services.

8

58. Plaintiff did not register on any website that could have provided Defendant or its vendors with the requisite consent to call her about insurance products or services.

59. Plaintiff was not in the market for Defendant's services and/or Medicare services.

60. Plaintiff did not provide Defendant or anyone acting on its behalf "prior express written consent" as that term is defined in 47 C.F.R. § 64.1200(f)(9) or any other form of consent to place calls to her.

61. Beginning in October 2023, Plaintiff began receiving a litany of phone calls from Defendant's vendors (or the vendor's sub-vendors) attempting to connect her to Defendant so that Defendant could sell her Medicare products or services.

62. For example, Defendant's vendor DMS produced records indicating DMS called Plaintiff on behalf of Defendant on the following dates:

    a. October 23, 2023 (twice);

    b. October 24, 2023 (three times);

    c. October 25, 2023 (three times);

    d. October 26, 2023 (once); and

    e. November 7, 2023 (twice).

63. DMS also used a sub-vendor Boomsourcing to call Plaintiff with prerecorded or artificial voice screening calls. Boomsourcing produced records indicating that Boomsourcing called Plaintiff on behalf of Defendant on the following dates:

    a. October 26, 2023 (once);

    b. October 27, 2023 (three times);

    c. October 28, 2023 (twice);

    d. October 30, 2023 (twice);

9

e.  October 31, 2023 (three times);

f.  November 1, 2023 (three times);

g.  November 2, 2023 (7 times);

h.  November 3, 2023 (7 times);

i.  November 4, 2023 (once);

j.  November 6, 2023 (two times);

k.  November 7, 2023 (two times).

64.     Boomsourcing's records reveal that Plaintiff made do-not-call requests during two separate calls on November 3, 2023.

65.     The calls Plaintiff received from Boomsourcing on behalf of Defendant utilized prerecorded or artificial voice technology.

66.     For example, the call on November 3, 2023 played a prerecorded message after Plaintiff answered that said, "Hello this is Crystal calling from Medicare Rewards.  How are you doing."

67.     The call sounded prerecorded and/or as utilizing an artificial voice as the "caller's" cadence was unnatural and sounded recorded.

68.     Plaintiff began complaining about the call, and the recording stopped abruptly.  She said to stop calling during the call and the call terminated.

69.     The call on November 7, 2023 also played a prerecorded message after Plaintiff answered and/or utilized artificial voice technology before transferring Plaintiff to Defendant.

70.     The call sounded prerecorded and/or as utilizing an artificial voice as the "caller's" cadence was unnatural and sounded recorded.

10

71.     Defendant's vendor Fluent produced records indicating Fluent called Plaintiff on behalf of Defendant on the following dates and times:

   a.   October 19, 2023 (once)

   b.   October 25, 2023 (five times);

   c.   October 31, 2023 (once);

   d.   November 20, 2023 (once);

   e.   November 29, 2023 (three times);

   f.   December 4, 2023 (once);

   g.   December 6, 2023 (once);

   h.   December 11, 2023 (once);

   i.   January 12, 2024 (once);

   j.   January 15, 2024 (six times);

   k.   January 16, 2024 (three times);

   l.   January 17, 2024 (one time);

   m.   January 18, 2024 (one time);

   n.   January 24, 2024 (one time);

   o.   January 30, 2024 (one time);

   p.   January 31, 2024 (one time);

   q.   March 4, 2024 (one time);

   r.   March 4, 2024 (two times);

   s.   March 5, 2024 (two times);

   t.   March 8, 2024 (one time);

   u.   March 13, 2024 (two times);

11

72.     Plaintiff answered at least two of these calls and asked the callers to stop calling her.

73.     On information and belief, Plaintiff received additional calls in October 2023 that she did not answer and/or answered and hung up on the callers in an attempt to get the calls to stop.

74.     Each of the calls Plaintiff answered appeared on Plaintiff's phone as having originated from phone numbers with a 609-area code. On information and belief, these were spoofed numbers which shared Plaintiff's area code so as to make it more likely she would answer the call, thinking it was a local number.

75.     As noted above, these harassing Medicare-related calls continued into November 2023. Between November 1 and November 6, 2023, Plaintiff answered at least seven of these calls and asked the callers to stop calling her during each of these calls.

76.     Each of the November 1 through November 6 calls Plaintiff answered appeared on Plaintiff's phone as having originated from phone numbers with a 609-area code. On information and belief, these were spoofed numbers which shared Plaintiff's area code so as to make it more likely she would answer the call.

77.     On November 7, 2023, Plaintiff received another Medicare-related call. This call sounded to Plaintiff to be similar to the calls she had received in October and early November.  In fact, it was a call that originated with Boomsourcing that utilized an artificial or prerecorded voice. Plaintiff could tell that the call was not a real human due to the monotone nature of the call and the way it abruptly cut off between recorded phrases.

78.     In an effort to determine who was calling her and to put a stop to the annoying and harassing Medicare calls, engaged in a conversation with the caller. The caller attempted to sell

Medicare-related insurance to Plaintiff. The initial caller transferred Plaintiff to another representative. Plaintiff was eventually transferred to a representative who advised they were calling from "SmartMatch" and also advised that SmartMatch was located in Kansas City. This person advised their name was "Bill Sanders" and stated his phone number was 844-495-2100, extension 6179.

79.     The phone call on November 7, 2023, appeared as having originated from phone number 609-256-9115. On information and belief, this was a spoofed number which shared Plaintiff's area code so as to make it more likely she would answer the call.

80.     The phone number 844-295-2100 extension 6179, which was referenced in the call to Plaintiff, is a phone number is used by Defendant and is listed on Defendant's website, www.smartmatch.com/agents/bj-sanders as being associated with Defendant's "agent" named "BJ Sanders."

81.     Mr. Sanders's agent profile on Defendant's website identifies Mr. Sanders's "National Producer Number" and states, "At SmartMatch, we treat the Medicare shopping process as a collaboration, a partnership between client and agent. As your trusted insurance agent, my goal is to educate you about your options, providing all the information you need to make the right coverage decisions."

82.     Plaintiff advised Mr. Sanders that she did not wish to be contacted again.

83.     On April 8, 2024, Plaintiff received a call from or on behalf of Defendant. The caller stated they were calling for "SmartMatch." Plaintiff then immediately advised the caller that her phone number was on the DNC List.

84.     The phone call on April 8, 2024, appeared as having originated from phone number 609-628-9484. On information and belief, this was a spoofed number which shared Plaintiff's area code so as to make it more likely she would answer the call.

85.     On information and belief, each of the calls detailed in this Complaint were placed by or on behalf of Defendant.

86.     On information and belief, Plaintiff received at least an additional 30 phone calls from or on behalf of Defendant besides the calls specifically referenced in this Complaint and continues to receive such calls.

87.     Other consumers, like Plaintiff, also received a litany of unwanted and unsolicited telemarketing calls from Defendant.

88.     Some of these consumers submitted complaints about Defendant's telemarketing practices to the FCC.

89.     One consumer complained, "I keep receiving phone calls from spoofed numbers. Every time it is a robo greeting trying to adjust Medicaid insurance. . . . I've asked these people nicely numerous times to stop calling me and they simply will not stop. They spoof numbers in my [area] (sic) code as well. I am being harassed by these people and need some relief. . . ."

90.     Another consumer complained, "Smart Match Ins called me 7 times in one day. After informing them I was on the no call list they said they could call me any time they wanted and there was nothing I could do about it."

91.     Many consumers also complained to the Better Business Bureau about Defendant's unsolicited and improper telemarketing practices. For example, one consumer made a complaint to the BBB stating, "A business continues to call me, leaving voicemails, filling my inbox or

handing up but continuing to call and harass me. I have had no dealings with this business since the initial call I answered and told them I wasn't interested."

92.     Defendant responded to this complaint by stating, "Thank you for bringing this to our attention. We're so sorry for the inconvenience. We've added your phone number to our 'Do Not Call' list **so you should not receive any further calls from our agency**."

93.     Another consumer made a complaint to the BBB about Defendant, stating, "This company has been calling [my] (sic) cell phone constantly, even though I am on a national DO NOT CALL LIST! No ethical company does that! And when I block one number from them, I get calls from other numbers!"

94.     Another consumer complained to the BBB about Defendant, stating, "This company relentlessly spams my phone number multiple times a day. I have never done any business with the company, nor will I ever. I have no idea how I got on their call list."

95.     Another consumer complained to the BBB about Defendant, stating, "I have been called multiple times over the past two days from different numbers. When I answer, the call hangs up. Caller ID says SmartMatch Insurance. They do not leave a voicemail. I am not seeking any kind of insurance as my employer covers 100% of my insurance premium. I'm also not 65. Please stop calling."

96.     Another consumer complained to the BBB about Defendant, stating, "STOP CALLING THE PHONE NUMBER THAT IS LISTED. REMOVE THE NUMBER FROM YOUR CALL LIST. I do not have Medicare parts A and B, nor will I ever. Stop having your third party goons spam calling me with spoofed numbers . . . ."

97. Another consumer complained about Defendant, stating, "SmartMatch violated TCPA Fed Law 227b and 227c as my cell has been on the Do Not Call List since 10/20/2004 & I did not give them or their marketing company expressed written consent to call me. . . .":

98. On information and belief, the purpose of each of Defendant's calls to Plaintiff and the putative class members was to attempt to get Plaintiff and the putative class members to purchase insurance products or services from Defendant or Defendant's clients.

99. Plaintiff and the putative class members did not provide Defendant "prior express written consent" as defined in 47 C.F.R. § 64.1200(f)(9) or any other form of consent to Defendant to place calls to their phones.

100. On information and belief, Defendant knew or had reason to know that it should not place calls to Plaintiff and the putative class members, yet incessantly placed calls to them.

101. The calls Defendant placed to Plaintiff and the putative class members were harassing, irritating, invasive and annoying.

102. Defendant's calls invaded Plaintiff's and the putative class members' right to privacy, namely the right to be left alone from unwanted telemarketing phone calls.

103. Defendant's calls caused Plaintiff and the putative class members to waste time and be disrupted from their daily activities, addressing and/or responding to the unwanted calls.

**DIRECT AND VICARIOUS LIABILITY**

104. On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside

16

of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

105.    Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.* at 6587 n. 107.

106.    The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

107.    Defendant is vicarious liable for the calls at issue in this case because it hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third parties (i.e., its vendors Fluent, DMS and Boomsourcing).

108.    Fluent, DMS and Boomsourcing had actual and/or apparent authority to act on behalf of Defendant.

109.    Likewise, Defendant ratified its third parties' violations of the TCPA by accepting leads and deriving profit from the improper calls.

110.    Defendant is not permitted under the law to outsource and contract its way out of liability by directing and benefiting from its agents' TCPA violations.

17

111.    As explained in detail above, Defendant controlled all aspects of the calling campaigns at issue.

112.    Defendant required and had the right and ability to approve and review the scripts to be used during the calls by its vendors.

113.    Defendant set parameters for the volumes of calls/leads Defendant would and could accept at any given time.

114.    Defendant required and was intimately involved in the lead generation process, reviewing URLs, creatives, website language and the like before accepting leads that were purported generated from those properties.

115.    Defendant accepted the benefit of these calls placed on its behalf by its vendors as Defendant sold its Medicare-related products and services as a result of the calls placed by its vendors.

116.    Defendant was aware of what transpired on the calls, as Defendant had access to and listed to certain of the calls of its vendors prior to transfer.

117.    Defendant provided feedback to its vendors regarding their calling practices.

118.    Defendant instructed the vendors how to transfer calls to Defendant so that Defendant could route the calls to its agents.

119.    Defendant has worked with its vendors to avoid liability for their illegal calling scheme.

120.    For example, in one case previously brought against Defendant in the United States District Court for the Western District of Missouri in which Defendant was accused of making unsolicited calls, Defendant submitted a declaration under penalty of perjury claiming Defendant was not aware of a website used to generate leads.

121.    However, the documents produced in the case show that Defendant was aware of, and approved the website, that it claimed it was unaware of in another action in this Court.

122.    Upon information and belief, Defendant has submitted false testimony in an effort to avoid liability and conceal its knowledge of its vendors practices.

123.    For the counts identified below, Defendant is vicariously liable for those unlawful calls placed by the vendors it contracted with and/or whom its vendors contracted with.


**CLASS ALLEGATIONS**

124.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this Complaint as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.

125.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiff seeks to represent the following class:

> **Prerecorded Call Class:**    All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom Defendant (or someone acting on its behalf) placed a call (2) that utilized a prerecorded message or artificial voice (3) concerning the solicitation of insurance or Medicare products.
>
> **DNC List Class:**  All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom Defendant (or someone acting on its behalf) placed two or more calls during a 12-month period; (2) where the calls were made for solicitation purposes, (3) whose number was registered on the DNC List for more than 31 days at the time the calls were placed; (4) where the phone number to which the calls were placed was registered to an individual, rather than a business.
>
> **Internal Do-Not-Call Class:** All persons in the United States who from four years prior to the filing of this action through the date a class is certified: (1) either Defendant (or someone acting on their behalf) called more than one time, (2) within any 12-month period, (3) marketing products and services, and, (4) after the person requested that Defendant stop calling.

19

126.    Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

127.    The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The names and phone numbers of the members of the proposed classes are readily identifiable through records available to Defendant or those acting on its behalf.

128.    Members of the proposed classes have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

129.    Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   a.   Whether the calls at issue utilized prerecorded messages or artificial voice technology;

   b.   Whether the calls at issue qualify as "telephone solicitations" for the purposes of 47 U.S.C. § 227(c);

   c.   Whether Defendant's conduct violates 47 U.S.C. § 227(b) and/or (c) of the TCPA;

   d.   Whether an agency relationship exists between Defendant and its vendors (i.e., Fluent, DMS, and/or Boomsourcing) that placed the calls at issue on Defendant's behalf;

   e.   Whether Defendant's manner and system of obtaining consumer "consent" was legally deficient;

   f.   Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

   g.   Whether Defendant and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

20

130.     Plaintiff's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed classes and are based on the same legal theories.

131.     Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed classes. Plaintiff's interests do not conflict with the interests of the proposed classes she seeks to represent. Plaintiff has retained lawyers who are competent and experienced in consumer litigation, the TCPA and class actions.

132.     Plaintiff's counsel will vigorously litigate this case as a class action, and Plaintiff and her counsel are aware of their responsibilities to the putative members of the classes and will discharge those duties.

133.     A class action is superior to all alternative methods of adjudicating this controversy, including through individual lawsuits. Joinder of all proposed members of the proposed classes in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For members of the proposed classes, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed classes had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

134.     In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

135.     Questions of law and fact, particularly the propriety of placing calls to person on the DNC List and/or persons who should have been placed on Defendant's internal DNC List, predominate over questions affecting only individual members.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227(c) *et seq.***
**(National DNC List Violations – Individually, and on Behalf of The Putative Class)**

136.     Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

137.     The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one telephone solicitation on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

138.     The penalty for each call placed in violation of the TCPA's restrictions on placing calls to phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

139.     In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting phone calls to phone numbers registered on the DNC List. *See* 47 U.S.C. §§ 227(c)(5)(A).

140.     By placing phone calls to Plaintiff and the putative class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c)(1) and/or the TCPA's corresponding regulations.

141.     Defendant and/or those acting on their behalf knew or should have known that Plaintiff's and the putative class members' phone numbers were registered on the DNC List.

142.    Defendant and/or those acting on their behalf willfully violated the TCPA when placing the calls at issue to Plaintiff's and the putative class members' phones.

143.    Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call placed by Defendant and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Lisa Cocciolillo, individually, and on behalf of all others similarly situated, requests the Court enter judgment in her favor on Count I and against Defendant SmartMatch Insurance Agency, LLC, and grant the following relief:

A. Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Plaintiff as the class representative;

B. Enter an order appointing Butsch Roberts & Associates LLC and The Weitz Firm, LLC as class counsel;

C. Enter judgment in favor of Plaintiff and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

E. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

F. Enter judgment in favor of Plaintiff and the Class for all costs; and,

G. Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## COUNT II
### Violations of the TCPA, 47 U.S.C. § 227(c) *et seq.*

23

**(Internal DNC List Violations – Individually, and on Behalf of The Putative Class)**

144. Plaintiff incorporates the allegations of the previous paragraphs as if fully stated in this Count.

145. Section 227(c) provides that it is a violation of the TCPA to violate any regulation promulgated under Section 227(c). 47 U.S.C. § 227(c)(5). 47 C.F.R. § 64.1200(d), a regulation that applies to Section 227(c), provides that the TCPA is violated where a company receives a request from a person to not be called and the company continues to call the person. 47 C.F.R. § 64.1200(d).

146. The penalty for each violation of Section 227(c) is up to $500 per call and up to $1,500.00 for each call if the violation is willful. 47 U.S.C. § 227(c)(5).

147. Defendant's conduct violates Section 227(c) and the TCPA's corresponding regulations because Plaintiff expressly and repeatedly advised Defendant to stop calling her, yet Defendant or someone acting on Defendant behalf continued to call Plaintiff.

148. The TCPA also provides that the called party can obtain injunctive relief. Plaintiff requests injunctive relief in the form of Defendant being required to cease all telephone communications with her and the putative class members. 47 U.S.C. § 227(c)(5).

149. Defendant's violations of the TCPA were willful in that Defendant or someone acting on Defendant's behalf continued to call Plaintiff and the putative class members after they repeatedly asked to no longer be contacted.

150. Defendant and/or those acting on their behalf knew or should have known that Plaintiff's and the putative class members' phone numbers should no longer have been contacted.

151. Defendant and/or those acting on their behalf willfully violated the TCPA when placing the calls at issue to Plaintiff's and the putative class members' phones.

24

152.     Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call placed by Defendant and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Lisa Cocciolillo, individually, and on behalf of all others similarly situated, requests the Court enter judgment in her favor on Count II and against Defendant SmartMatch Insurance Agency, LLC, and grant the following relief:

A.   Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Plaintiff as the class representative;

B.   Enter an order appointing Butsch Roberts & Associates LLC and The Weitz Firm, LLC as class counsel;

C.   Enter judgment in favor of Plaintiff and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D.   Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

E.   Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

F.   Enter judgment in favor of Plaintiff and the Class for all costs; and,

G.   Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## COUNT III
### Violations of the TCPA, 47 U.S.C. § 227(b) *et seq.*
**(Prerecorded Call Violations – Individually, and on Behalf of The Putative Class)**

153.     Plaintiff incorporates the allegations of the previous paragraphs as if fully stated in this Count.

154. Section 227(b) provides that it is a violation of the TCPA to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) to a cellular telephone number using an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A)(iii).

155. The penalty for each violation of Section 227(b) is $500 per call and up to $1,500.00 for each call if the violation is willful or knowing. 47 U.S.C. § 227(b)(3).

156. Defendant's conduct violates Section 227(b) and the TCPA because Defendant placed or had placed on its behalf prerecorded or artificial voice calls to Plaintiff.

157. These calls were not made for an emergency purpose.

158. These calls were not made with the prior express consent of Plaintiff.

159. Defendant's violations of the TCPA were willful in that Defendant or someone acting on Defendant's behalf continued to call Plaintiff and the putative class members after they repeatedly asked to no longer be contacted.

160. Plaintiff and the putative class members are entitled to damages of $500.00 per violation for each call placed by Defendant and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Lisa Cocciolillo, individually, and on behalf of all others similarly situated, requests the Court enter judgment in her favor on Count III and against Defendant SmartMatch Insurance Agency, LLC, and grant the following relief:

    A. Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Plaintiff as the class representative;

B.  Enter an order appointing Butsch Roberts & Associates LLC and The Weitz Firm, LLC as class counsel;

C.  Enter judgment in favor of Plaintiff and the Prerecorded Call Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(b), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D.  Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions;

E.  Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

F.  Enter judgment in favor of Plaintiff and the Class for all costs; and,

G.  Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff Lisa Cocciolillo demands a jury trial.

Dated: December 22, 2025

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/ Christopher E. Roberts*
Christopher E. Roberts #61895MO
7777 Bonhomme Avenue, Suite 1300
Clayton, MO 63105
Telephone: (314) 863-5700
croberts@butschroberts.com

THE WEITZ FIRM, LLC

Max S. Morgan (admitted *pro hac* vice)
1515 Market Street #1100
Philadelphia, PA 19102
Telephone: (267) 587-6240
max.morgan@theweitzfirm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Christopher E. Roberts*