**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| LISA COCCIOLILLO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>SMARTMATCH INSURANCE AGENCY, LLC,<br><br>Defendant. | Case No.: 4:24-CV-00627-SRB |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS


Table of Contents .................................................................................................... ii

Table of Authorities ..............................................................................................iii-iv

I. Introduction..............................................................................................................1

II. Factual Allegations..................................................................................................2

A. Defendant's Business Model.........................................................................2

B. Defendant's Immense Control Over Its Telemarketing Vendors ............. 2-4

C. Defendant's Incessant Calls to Plaintiff.................................................... 4-6

D. Defendant's Incessant Calls to Other Consumers .................................... 6-7

III. Argument ........................................................................................................... 7-8

A. Defendant is vicariously liable for the calls placed by its telemarketing vendors ........................................................................................... 8-9

1. Defendant had an agency relationship with its telemarketing vendors ........................................................................... 9-10

2. Defendant exercised actual authority over its telemarketing vendors ......................................................................... 10-11

3. Defendant had apparent authority to place the telemarketing calls to Ms. Cocciolillo..................................................................11

4. Defendant ratified the acts of its telemarketing vendors ......... 11-12

B. Plaintiff's class definitions are properly pled (especially before class discovery has commenced). ............................................................... 12-13

1. Defendant's motion to strike is especially improper where discovery has been limited to individual, not class, issues ...... 13-14

2. Plaintiff does not plead "fail-safe" classes.............................. 14-15

V. Conclusion ...........................................................................................................15

Certificate of Service ..............................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Abboud v. Circle K Stores Inc.*, 731 F. Supp.3d 1094 (D. Ariz. 2024)..........................................15

*Bishop v. DeLaval Inc.*, 2020 WL 4669185 (W.D. Mo. Jan. 28, 2020) (Bough, J.) ......................12

*Blunkall v. Heavy & Specialized Haulers, Inc.*, 398 S.W.3d 534 (Mo. App. 2013) .................... 8-9

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) .....................................................................8

*Ccmh Minneapolis, LLC v. Berger Transfer & Storage, Inc.*, 2009 WL 10710735 (D. Minn. Jan. 27, 2009) ..........................................................................................................................................8

*Charvat v. Allstate Corp.*, 29 F.Supp.3d 1147 (N.D. Ill. 2014).......................................................8

*Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38 (D. Mass. 2022) ......................................................15

*Eagle v. GVG Capital, LLC*, 2023 WL 1424537 (W.D. Mo. Jan. 31, 2023) (Bough, J.)...............12

*Giesmann v. Am. Homepatient, Inc.*, 2015 WL 3548803 (E.D. Mo. June 8, 2015).......................13

*Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) ..........................................................8

*Gonzalez v. Burger Law, LLC*, 2024 WL 1014058 (E.D. Mo. Mar. 8, 2024) .................................9

*Golan v. Veritas Entm't, LLC*, 2017 WL 2861671 (E.D. Mo. July 5, 2017) .................................10

*Golan v. Veritas Entm't, LLC*, 2016 WL 880402 (E.D. Mo. Mar. 8, 2016) .............................. 9-10

*Gould v. Farmers Ins. Exch.*, 288 F. Supp.3d 963 (E.D. Mo. 2018)...................................... 10-12

*Hand v. Beach Entm't KC, LLC,* 456 F. Supp.3d 1099 (W.D. Mo. 2020).......................................7

*Hewitt v. Synchrony Bank,* 2017 WL 6349051 (W.D. Mo. Dec. 12, 2017) ....................................7

*Hiller v. Money Source Inc.,* 2025 WL 1331702 (D. Ariz. May 7, 2025).....................................14

*Hughes v. Circle K Stores, Inc.*, 740 F. Supp.3d 721 (C.D. Ill. 2024) .................................... 14-15

*In re Pork Antitrust Litig.,* 2019 WL 3752497 (D. Minn. Aug. 8, 2019)......................................15

*Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025) .........................11

*Jubb v. CHW Grp., Inc.*, 2025 WL 942961 (D.N.J. Mar. 28, 2025) .............................................11

*Katz v. CHW Grp., Inc.*, 2023 WL 6445798 (W.D. Ark. Sep. 29, 2023) ......................................15

*Lee v. Plex, Inc.*, 773 F. Supp. 3d 755 (N.D. Cal. Mar. 28, 2025) ................................................13

*Lindsay Transmission, LLC v. Office Depot, Inc.*, 2013 WL 275568 (E.D. Mo. Jan. 24, 2013) ...15

*Mattson v. New Penn Fin., LLC*, 2018 WL 6735088 (D. Or. Nov. 6, 2018)..................................13

*Monroe v. Freight All Kinds, Inc.*, 2020 WL 6588353 (W.D. Mo. Nov. 10, 2020) (Bough, J.).......8

*Newhart v. Quicken Loans, Inc.*, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016).............................14

*O'Connor v. Diversified Consultants, Inc.*, 2013 WL 2319342 (E.D. Mo. May 28, 2013)...........14

*Robertson v. Mortg. Rsch. Ctr., LLC*, 2024 WL 5046604 (W.D. Mo. Dec. 9, 2024)............... 12-13

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016) ..........................13

*Smith v. Truman Road Dev.,* 2020 WL 2044730 (W.D. Mo. Apr. 18. 2020)................................ 8-9

*St. Louis Heart Ctr., Inc. v. Forest Pharms., Inc.,* 2013 WL 1076540 (E.D. Mo. Mar. 13, 2013).13

*Stanbury Law Firm v. I.R.S.*, 221 F. 3d 1059 (8th Cir. 2000) .......................................................12

*Walker v. World Tire Corp.*, 563 F.2d 918 (8th Cir. 1977) ...........................................................13

*Waterhout v. Associated Dry Goods, Inc.* 835 F.2d 718 (8th Cir. 1987) ..........................................8

*Zakarian v. Rawlings Co. LLC*, 2024 WL 5036664 (W.D. Mo. Aug. 29, 2024) (Bough, J.).........12

**Statutes, Regulations and Federal Rules**

47 U.S.C. § 227(b)(1)(A)..........................................................................................................7

47 U.S.C. § 227(c)(5)................................................................................................................7

47 C.F.R. 64.1200(c)..................................................................................................................7

Fed. R. Civ. P. 15(a)(2) ...........................................................................................................15

**FCC Rulings**

*In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574 (2013) .....8, 10-11

**Other Authorities**

Federal Communications Commission – Stop Unwanted Robocalls and Texts (Mar. 3, 2025) *available at* https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Feb. 3, 2026) ..........................................................................................................1

## I. INTRODUCTION

Incessant telemarketing calls are an unrelenting problem in this county. Telemarketing complaints are typically the top annual consumer complaint to government officials. *See generally* Federal Communications Commission – Stop Unwanted Robocalls and Texts (Mar. 3, 2025) *available at* https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts (last visited Feb. 3, 2026). Fortunately for consumers like Plaintiff Lisa Cocciolillo ("Plaintiff" or "Ms. Cocciolillo"), the Telephone Consumer Protection Act ("TCPA") provides recourse against these incessant and unwanted telemarketing calls. More fortunately, the TCPA prevents telemarketers like Defendant SmartMatch Insurance Agency, LLC ("Defendant") from avoiding TCPA liability, or skirting the Centers for Medicare & Medicaid Services ("CMS") telemarketing regulations, by simply having third-party telemarketing vendors place the illegal calls on their behalf.

Ms. Cocciollillo received at least 81 telemarketing calls from Defendant's telemarketing campaign. She received these calls despite placing her phone number on the National Do-Not-Call Registry ("DNC List") and despite never providing Defendant nor its vendors any form of permission to call her. Defendant engaged in an illegal scheme with its vendors to place a high volume of illegal cold calls that were designed to conceal Defendant's identity until a consumer seemed interested in Defendant's Medicare products. Defendant's vendors would spoof numbers ensuring they couldn't be traced back to Defendant. Defendant would also have its vendors use vague and fictious names at the start of the call, like "Medicare Rewards" to avoid the illegal activity being tracked back to Defendant. Only after the called party was screened and met the criteria dictated by Defendant was the consumer made aware that Defendant was behind the call.

After being fed up with receiving dozens of Medicare-related calls and continuing to receive them despite demanding the calls stop (which is documented in Defendant's vendors'

records) , Ms. Cocciolillo acted interested during a call to determine who had been calling her. The call was then transferred to one of Defendant's insurance agents standing ready to sell Ms. Cocciolillo Medicare-related products, revealing Defendant was behind the calling operation.

Defendant now attempts to do what the TCPA prohibits - shield itself from liability by simply pointing the finger at its third-party telemarketing vendors for placing these calls – that are an important and initial cog in Defendant's scheme. The TCPA does not allow for this. This is especially prohibited where Defendant's contract and/or its conduct with its telemarketing vendors: (1) required Defendant to approve the scripts that would be used by the vendors on the telemarketing calls; (2) provided Defendant the right to approve these scripts; (3) provided Defendant the right to audit the telemarketing calls (a right exercised by Defendant); (4) permitted Defendant the right to provide feedback on the calls; (5) allowed Defendant to instruct the vendors how to transfer the calls to Defendant; (6) allowed Defendant to set parameters as to the volume of calls placed by the vendors; and, (7) required Defendant to review domain names and the website content of websites that would be used to generate leads for Defendant.

Moreover, despite being granted its request for bifurcated discovery and limiting discovery to that of Plaintiff, Defendant now contends that Plaintiff's class definitions are improper and should be stricken. Notwithstanding that Plaintiff's class definitions are properly pled at this stage of the case, Defendant's motion to strike is procedurally flawed.

The Court should therefore deny Defendant's motion for the reasons set forth in this memorandum.

## II. FACTUAL ALLEGATIONS

### DEFENDANT'S BUSINESS MODEL

Defendant is a company that sells Medicare insurance products and services through placing telemarketing phone calls. (First Amended Complaint, Doc. 47, ¶¶ 14, 20). Defendant places these telemarketing calls directly and through its vendors and their sub-vendors. *Id.* at ¶ 20. These calls are live and prerecorded. *See id.* at ¶¶ 5-6, 61-73. Defendant purports that it helps consumers compare available Medicare products and then "connects" these consumers "with a licensed insurance agent." *Id.* at ¶ 17.

### DEFENDANT'S IMMENSE CONTROL OVER ITS TELEMARKETING VENDORS

Defendant's parent company entered into various agreements with telemarketing vendors named Fluent, LLC ("Fluent") and Digital Media Solutions, LLC ("DMS"). *Id.* at ¶¶ 24-25. These agreements provided that Fluent and DMS would provide Defendant with "transfer leads" through its calling campaigns that met "the requirements specified by Defendant." *Id.* at ¶¶ 20, 26. Defendant exercised and had the right to exercise control over the lead generation processes used by its vendors. For example, Defendant required the review of domain names and website language utilized by its vendors before accepting leads that derived from those websites. *Id.* at ¶ 114.

Defendant controlled all aspects of Fluent's and DMS' calling campaigns. *Id.* at ¶ 111. Defendant required approval of scripts that could be used during the calls placed by its vendors. *Id.* at ¶ 112. Defendant had the right to review and approve these scripts. *Id.* Defendant set parameters for the volume of calls/leads that it would and could accept. *Id.* at ¶ 113.

Defendant's agreements with its telemarketing vendors also gave Defendant the right to audit calls placed by these vendors, and Defendant exercised that right. *Id.* at ¶ 50. Defendant also provided feedback regarding their vendors' calling practices. *Id.* at ¶ 49, 117. Because Defendant

had access to the call recordings, listened to them, and provided feedback regarding them, Defendant was aware of, approved and directed its vendors conduct. *Id.* at ¶ 47-49, 116. Defendant also instructed the vendors how to transfer calls to Defendant so that Defendant could route the calls to its agents. *Id.* at ¶ 118.

Defendant even went as far as to work with its vendors to avoid liability for their improper telemarketing calls. *Id.* at ¶¶ 51-52, 119. For example, Defendant and its telemarketing vendors subscribed to databases that identified phone numbers associated with TCPA lawyers and persons who had previously made complaints about unwanted or illegal calls. *Id.* at ¶ 51. Defendant would then use this information to terminate the calls before Defendant's identity would be revealed to a consumer during the call progression. *Id.* at ¶ 52. When called to task for its illegal telemarketing campaigns, Defendant will claim ignorance, point the finger at its vendors and disclaim responsibility, and go as far as submitting false testimony to federal courts. *See id.* at ¶¶ 120-122.

**DEFENDANT'S INCESSANT CALLS TO PLAINTIFF**

Plaintiff is the owner of a cell phone, bearing number 609-XXX-6390. *Id.* at ¶ 53. Plaintiff placed her phone number on the National Do-Not-Call Registry on March 27, 2007, for the purpose of being left alone by telemarketers. *Id.* at ¶ 54. Plaintiff's phone number is a personal line, not a business number. *Id.* at ¶¶ 55-56.

Plaintiff was not in the market for Defendant's services and/or Medicare services. *Id.* at ¶ 59. As such, Plaintiff never inquired of or requested Defendant's services. *Id.* at ¶ 57. Plaintiff also did not register on any website that could have provided Defendant or its vendors with consent to call her about insurance products or services, nor did she provide any form of consent to be contacted by Defendant or anyone acting on its behalf. *Id.* at ¶¶ 58, 60.

Despite having communicated to the world that she did not want unsolicited telemarketing calls via her registration on the DNC List, not being in the market for Defendant's services, and not providing Defendant or anyone acting on its behalf consent to be contacted; Plaintiff began receiving a litany of phone calls from Defendant's vendors (or the vendor's sub-vendors). *Id.* at ¶ 61. These calls attempted to connect Plaintiff to Defendant so that Defendant could sell Medicare products and services to Plaintiff. *Id.* at ¶ 61.

Defendant, through its contracted vendors, called Plaintiff at least 81 times, and likely over 110 times. *See id.* at ¶¶ 62-63, 71, 73, 86. DMS directly called Plaintiff 11 times on behalf of Defendant between October 23, 2023, and November 7, 2023. *Id.* at ¶ 62. DMS also called Plaintiff 33 times between October 26, 2023, and November 7, 2023, on behalf of Defendant through its vendor called Boomsourcing. *Id.* at ¶ 63.[1] Fluent called Plaintiff 37 times on behalf of Defendant between October 19, 2023, and March 13, 2024. *Id.* at ¶ 71. Plaintiff demanded that the callers stop calling her during these calls at least 11 times. *See id.* at ¶¶ 64, 72, 75.

Each of the calls appeared on Plaintiff's phone as having originated from her same area code, "609." *Id.* at ¶ 74. These phone numbers were "spoofed" to share Plaintiff's area code so that Plaintiff would be more likely to answer the calls. *Id.*

After receiving a litany of Medicate-related calls and being unable to stop them, on November 7, 2023, Plaintiff decided to determine precisely who was incessantly calling her phone. *Id.* at ¶¶ 75, 77-78. Plaintiff received another Medicare-related call on November 7, which were like the calls she previously received. *Id.* at ¶ 77. This call, like the others, originated with a "609"

---

[1] Boomsourcing uses prerecorded or artificial voice technology on the calls. *Id.* at ¶ 65. The use of artificial voice or prerecorded voice technology allows vendors to place a higher number of initial screening calls inexpensively and quickly. Given that cold calls typically have successful conversion rates of around 1%, it is no surprise that this technology was employed here to screen as many individuals as possible before passing them to a live person for additional screening.

area code. *Id.* at ¶ 79. The call originated with Boomsourcing and utilized an artificial or prerecorded voice. *Id.* Plaintiff engaged with the caller – and the initial recorded or artificial voice representative transferred Plaintiff to another representative. *Id.* at ¶ 78. Plaintiff was then eventually transferred to a representative who advised they were calling from "SmartMatch" and that they were in Kansas City. *Id.* The representative then advised that their name was "Bill Sanders" and that his phone number was 844-495-2100, extension 6179. *Id.* Plaintiff then advised Mr. Sanders that she no longer wished to be contacted by Defendant. *Id.* at ¶ 82.

The phone number provided by Mr. Sanders is identified on Defendant's website as being associated with Defendant's "agent" named "BJ Sanders." *Id.* at ¶ 80. Mr. Sanders's profile on Defendant's website identifies his "National Producer Number" and states, "At SmartMatch, we treat the Medicare shopping process as a collaboration, a partnership between client and agent. . ." *Id.* at ¶ 81.

Despite telling Mr. Sanders that she did not want further calls, Plaintiff received another phone call from or on behalf of Defendant on April 8, 2024. *Id.* at ¶ 83. The caller stated that they were calling from "SmartMatch." *Id.* Plaintiff again advised that her phone number was on the DNC List. *Id.*

**DEFENDANT'S INCESSANT CALLS TO OTHER CONSUMERS**

As Plaintiff was not alone in receiving unwanted and incessant calls from Defendant, she filed a class action complaint against Defendant. *See id. passim*. Numerous other consumers experienced identical harassment. *See id.* at ¶¶ 88-97. Like Plaintiff, consumers also: (1) received calls from Defendant utilizing spoofed numbers; (2) received robocalls from Defendant about Medicare; (3) received calls from Defendant despite being on the DNC List; and, (4) received calls from Defendant despite never providing consent for the call *See id.* Ultimately, Defendant

"accepted the benefit" of these illegal calls by making sales as a result of these calls. (Doc. 47 at ¶¶ 107, 109-110, 115).

Plaintiff therefore brought three distinct claims against Defendant for violating the TCPA. *Id.* at ¶¶ 125, 136-160. First, Plaintiff brings a claim against Defendant under Section 227(c) of the TCPA for placing calls to her and the putative class members despite their phone numbers being on the DNC List. *Id.* at ¶¶ 136-43. Second, Plaintiff brings a claim against Defendant under Section 227(c) of the TCPA for placing calls to her and the putative class members despite Plaintiff and the putative class members requesting that the calls stop (i.e. an Internal DNC List claim). *Id.* at ¶¶ 144-52. Last, Plaintiff brings a claim against Defendant under Section 227(b) of the TCPA for placing prerecorded and/or artificial calls to her and the putative class despite not having consent to place such calls. *Id.* at ¶¶ 153-60.

## III. Argument

Defendant does not contest that Plaintiff sufficiently pleads the elements of her TCPA claims.[2] Rather, Defendant simply contends that it cannot be held vicariously liable for the calls placed by its telemarketing vendors. (*See generally* Doc. 50-1 *passim*). This memorandum therefore focuses on vicarious liability under the TCPA instead of the elements of each of

---

[2] A person has a claim under Section 227(c) of the TCPA where they have received more than one telephone call within a 12-month period that violates the TCPA's regulations. *See Hand v. Beach Entm't KC, LLC*, 456 F. Supp.3d 1099, 1119 (W.D. Mo. 2020) (citing 47 U.S.C. § 227(c)(5)). It is a violation of the TCPA's regulations to place a telephone solicitation call to a phone number registered on the DNC List. *Id.* (citing 47 C.F.R. 64.1200(c)). It is also a violation of Section 227(c) to continue to place calls to persons who request to not receive telemarketing calls (i.e. to be placed on a company's Internal Do-Not-Call List). *Id.* at 1123-26 (citing 47 C.F.R. 64.1200(d)).

A person has a claim under Section 227(b) of the TCPA where a prerecorded and/or artificial voice call is placed to their cell phone without providing the requisite form of consent to receive the call. *See generally Hewitt v. Synchrony Bank*, 2017 WL 6349051, at *2 (W.D. Mo. Dec. 12, 2017) (citing 47 U.S.C. § 227(b)(1)(A)).

Plaintiff pleads the elements of all three of her TCPA claims and Defendant does not contend otherwise. (*See* Doc. 47 *passim*; Doc. 50-1 *passim*).

Plaintiff's TCPA claims. The allegations in the complaint make clear that Defendant is vicariously liable for the calls placed to Plaintiff by its telemarketing vendors under multiple theories.

### A. Defendant is vicariously liable for the calls placed by its telemarketing vendors.

The TCPA provides that a "principal may be held liable under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Smith v. Truman Road Dev.*, 2020 WL 2044730, at *18 n. 8 (W.D. Mo. Apr. 18. 2020) (quoting *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013)). In other words, both direct and vicarious liability may attach to violations of the TCPA. *See generally Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016); *see also Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 961 (8th Cir. 2019).

The existence of an agency relationship is normally a "fact question left to the trier of fact." *Smith*, 2020 WL 2044730, at *18 (quoting *Waterhout v. Associated Dry Goods, Inc.* 835 F.2d 718, 720 (8th Cir. 1987).[3] To establish a principal-agent relationship, "the principal must have a right to control the agent." *Monroe v. Freight All Kinds, Inc.*, 2020 WL 6588353, at *2 (W.D. Mo. Nov. 10, 2020) (Bough, J.) (quoting *Blunkall v. Heavy & Specialized Haulers, Inc.*, 398 S.W.3d 534, 541 (Mo. App. 2013). In a TCPA case, the "control necessary to establish agency" exists where the

[3] Because agency is a question of fact, it is not appropriately decided on a motion to dismiss. *See, e.g., Charvat v. Allstate Corp.*, 29 F.Supp.3d 1147, 1151 (N.D. Ill. 2014) (denying defendant's motion to dismiss TCPA case, holding that "it is defendants, not plaintiff, who can reasonably be expected to know these facts, and plaintiff's allegations, taken together, suffice to entitle him to discovery on the issue of vicarious liability"). *See also Ccmh Minneapolis, LLC v. Berger Transfer & Storage, Inc.*, 2009 WL 10710735, at *2 (D. Minn. Jan. 27, 2009) ("Resolution of [the agency issue] is especially inappropriate on a motion to dismiss for failure to state a claim."). Defendant asked the Court to allow the parties to conduct discovery on this issue, followed by dispositive motions. While Plaintiff's complaint does not include *all* the facts learned during that discovery period on vicarious liability, it contains more than enough. Defendant is merely preparing to take two bites at the apple by filing this motion and a subsequent motion for summary judgment.

defendant/principal "controlled or had the right to control the agent" and the telemarketing campaigns at issue. *Smith*, 2020 WL 2044730, at *19.

Here, Plaintiff alleges not only a general agency relationship between Defendant and its vendors – she also alleges that Defendant can be vicariously liable through actual authority, apparent authority and ratification.

### 1. Defendant had an agency relationship with its telemarketing vendors.

Vicarious liability can be established in a TCPA context through "a formal agency relationship, such as a contract." *Gonzalez v. Burger Law, LLC*, 2024 WL 1014058, at *3 (E.D. Mo. Mar. 8, 2024). Agency is sufficiently alleged where a contract simply provides that the principal sets criteria for leads provided by the agent to the principal and the agent places phone calls on the principal's behalf. *See id.* The *Gonzalez* court found an agency relationship was pled where the TCPA plaintiff made these allegations and asserted that she was transferred to the defendant on at least one call. *Id.*

This case is significantly stronger than *Gonzalez.* Defendant had written agreements with its vendors, approved the scripts used by the vendors, audited the calls made by its vendors, provided feedback about the calls to its vendors, instructed the vendors how to transfer the calls to Defendant, set parameters about the volume of the calls, and had control over how the vendors sourced the leads on websites. *See infra.* Defendant's vendors were clearly an appendage of Defendant used to expand Defendant's robust telemarketing operation. The allegations in the Amended Complaint are more than sufficient to allege vicarious liability.

Vicarious liability can also be established "without a formal agency relationship." *Golan v. Veritas Entm't, LLC*, 2016 WL 880402, at *4 (E.D. Mo. Mar. 8, 2016). Rather, an agency relationship can be established through principles of "ratification and apparent authority." *Id.* As

discussed below, Defendant is also liable for the calls of its telemarketing vendors (and sub-vendors) under these principles.

### 2. Defendant exercised actual authority over its telemarketing vendors.

Actual authority exists in a TCPA case where a defendant "has the ability to oversee the conduct of telemarketers, even if unexercised." *Gould v. Farmers Ins. Exch.*, 288 F. Supp.3d 963, 969 (E.D. Mo. 2018) (quoting *Golan v. Veritas Entm't, LLC*, 2017 WL 2861671, at *10 (E.D. Mo. July 5, 2017)). Not only was Defendant able to oversee its telemarketing vendors' activities, but it oversaw these activities "and was the final authority for implementation of the telemarketing scheme." *Golan*, 2017 WL 2861671, at *10; (*see* Doc. 47 at ¶¶ 24-52; 107-123). Plaintiff's allegations regarding control are stronger than those in *Gould*. Not only did Defendant control and oversee the calling operations here, it provided scripts and feedback, it maintained complete control on how the leads would be initially acquired and directed how they would be funneled to Defendant. Defendant's argument related to Boomsourcing is misguided – as Plaintiff pleads Defendant controlled all aspects of the campaign from start (lead generation) to end (transfer call). Because Defendant could listen to and audit calls, it would have necessarily been aware of, and approved, its vendors use of sub-vendors. The November 7, 2023, call, that connected to Defendant in which "SmartMatch" was identified, began with Boomsourcing. (Doc. 47 at ¶77).

Without citing any supporting case, Defendant baldly contends that, "Allegations that SmartMatch approved scripts or creatives, reviewed leads or call recordings, accepted transferred calls, or provided feedback reflect routine compliance and performance monitoring. They do not show control over the manner and means of telemarketing activity . . . ." (Doc. 50-1, p. 9). Case law establishes that such conduct establishes actual authority. *See Gould,* 288 F. Supp. 3d at 969 (actual authority pled where defendant was alleged to oversee its agents' telemarketing activities

by requiring approval and overseeing such activities); *Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359, at *5 (N.D. Ga. Aug. 7, 2025) (actual authority pled where defendant established "guidelines and scripts" for the telemarketing communications); *Jubb v. CHW Grp., Inc.*, 2025 WL 942961, at *5-6 (D.N.J. Mar. 28, 2025) (actual authority pled where defendant's telemarketing agents placed calls promoting defendant's services and the calls were transferred to defendant).

**3. Defendant had apparent authority to place the telemarketing calls to Ms. Cocciolillo.**

Apparent authority exists in a TCPA case where the party receiving the calls has a "reasonable basis to believe that [defendant's] agents were acting at [defendant's] direction." *Gould*, 288 F. Supp.3d at 970. Plaintiff certainly had a reasonable basis to believe that Defendant's agents were acting at Defendant's direction. After receiving similar Medicare-related telemarketing calls from similar spoofed numbers in which the caller's identity was concealed, Defendant finally revealed its identity by advising her that "SmartMatch" was calling. *See Gould,* 288 F. Supp. 3d. at 970. Like *Gould*, where apparent authority was pled where "Farmers Insurance" was identified in the telemarketing communications, at issue, "SmartMatch" was identified in communications to Plaintiff – all of which followed the same pattern. (Doc. 47 at ¶¶ 78, 83). Defendant instead ignores the allegations in the amended complaint and contends Plaintiff "fails to allege any consumer-facing manifestation by SmartMatch." (Doc. 50-1, p. 10). There is nothing more "consumer-facing" than Defendant: (1) telling Plaintiff they were calling from "SmartMatch" in Kansas City; and, (2) the representative telling Plaintiff his name and phone number, both of which appear on Defendant's website. (Doc. 47 at ¶¶ 75-81).

**4. Defendant ratified the acts of its telemarketing vendors.**

Ratification exists in a TCPA case where the defendant "knowingly accept[s] the benefits" of its agents' telemarketing activities. *Gould*, 288 F. Supp.3d at 970 (quoting *In the Matter of the*

*Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6586-87)). Here, Plaintiff alleges that Defendant accepted the benefit of the calls its vendors placed, as it sold Medicare-related products and services as a direct result of these calls. (Doc. 47 at ¶¶ 107, 109-110, 115). Under *Gould,* these allegations suffice to establish ratification. *Gould*, 288 F. Supp.3d at 970. Defendant continued to accept these benefits *knowing* its vendors were violating the law. (*See* Doc. 47 at ¶¶ 107, 109-110, 115). Indeed, Defendant went as far as submitting perjured testimony in an effort to avoid liability and conceal its knowledge of its vendor's practices in previous TCPA cases filed against Defendant. (Doc. 47 at ¶¶ 119-122).

The amended complaint sufficiently pleads vicarious liability through multiple avenues, and the Court should therefore deny Defendant's motion.

### B. Plaintiff's class definitions are properly pled (especially before class discovery has commenced).

"[S]triking a party's pleadings is an extreme measure, and, as a result . . . motions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted." *Stanbury Law Firm v. I.R.S.*, 221 F. 3d 1059, 1063 (8th Cir. 2000). As this Court has repeatedly held, "striking a Plaintiff's class action allegations prior to discovery and the class certification stage is a rare remedy." *Bishop v. DeLaval Inc.*, 2020 WL 4669185, at *1 (W.D. Mo. Jan. 28, 2020) (Bough, J.) (internal quotation and citation omitted); *see also Zakarian v. Rawlings Co. LLC*, 2024 WL 5036664, at *5-6 (W.D. Mo. Aug. 29, 2024) (Bough, J.) (same); *Eagle v. GVG Capital, LLC*, 2023 WL 1424537, at *2-3 (W.D. Mo. Jan. 31, 2023) (Bough, J.) (denying motion to strike in TCPA case). This is because the "parties should be afforded an opportunity to conduct discovery and present evidence on the issues raised by Plaintiff's class action allegations" thereby making such motions "premature." *Robertson v. Mortg. Rsch. Ctr., LLC*, 2024 WL 5046604, at *2 (W.D. Mo.

Dec. 9, 2024);[4] *see also Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977) ("The propriety of class action status can seldom be determined on the basis of the pleadings alone."). These principles are especially true in TCPA class actions because class certification is frequently granted as the primary questions at issue are often common to all recipients. *See generally Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 997 (8th Cir. 2016). These fundamental principles hold true here.

**1. Defendant's motion to strike is especially improper where discovery has been limited to individual, not class, issues.**

Defendant previously sought to bifurcate discovery to focus on Plaintiff's individual claim. (*See* Doc. 18 at 2). The Court bifurcated discovery and class discovery is not open. (*See* Doc. 23). Plaintiff has therefore not had an opportunity to conduct class discovery and present evidence to refute Defendant's hypothetical arguments about individualized issues and what class discovery may ultimately reveal. Simply put, the hypothetical issues raised by Defendant are better suited to be resolved on a motion for class certification with the benefit of a more robust record.

Defendant's strategy of asking the Court to restrict class discovery while later attacking class issues is improper. It is simply premature for the Court to strike Plaintiff's class allegations on the basis of hypothetical individualized issues articulated by Defendant at this early stage without the benefit of class discovery. *See Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 775 (N.D. Cal. Mar. 28, 2025); *Mattson v. New Penn Fin., LLC*, 2018 WL 6735088, at *3 (D. Or. Nov. 6, 2018) (denying motion to strike concluding "discovery could show valid consent, it could alternatively yield proof that Mattson's alleged consent or other documented consents were obtained

[4] *See also St. Louis Heart Ctr., Inc. v. Forest Pharms., Inc.*, 2013 WL 1076540, at *4-7 (E.D. Mo. Mar. 13, 2013) (denying motion to strike class allegations in TCPA case); *Giesmann v. Am. Homepatient, Inc.*, 2015 WL 3548803, at *4-6 (E.D. Mo. June 8, 2015) (same).

unlawfully"). Many of the cases relied on by Defendant highlight this principle as they were decided at the class certification stage with the benefit of a robust record. *See O'Connor v. Diversified Consultants, Inc.*, 2013 WL 2319342 (E.D. Mo. May 28, 2013) (class certification denied); *Newhart v. Quicken Loans, Inc.*, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016) (same).

Discovery may reveal that Defendant obtained leads unlawfully and directed its vendors to call them (without appropriate consent and without regard to National Do-Not-Call registration) and transfer the calls that met certain criteria to Defendant. These issues may be demonstrated on a class-wide basis using a limited set of a defendant's business records. *See generally Hiller v. Money Source Inc.,* 2025 WL 1331702, at *5 (D. Ariz. May 7, 2025) ("Based upon a review of the record, the Court foresees that the question of consent revocation will be amenable to a rather simple and straightforward resolution. . . . [T]he issue of consent revocation to be determined largely, if not entirely, based upon a limited set of documents that have already been subject to discovery, namely Defendant's business records.") This is exactly why striking class allegations is premature. Discovery is needed to determine whether class certification is appropriate and whether any of Defendant's arguments hold any water – especially in view of the well pled facts alleging Defendant had complete control over the calling campaigns including from lead acquisition to initial screening to transfer to Defendant's agents.

Striking class allegations based on Defendant's hypothetical arguments is not warranted.

**2. Plaintiff does not plead "fail-safe" classes.**

A "fail-safe" class is one that is not based on "objective criteria" but depends on the merits of the class member's claim. *See generally Hughes v. Circle K Stores, Inc.*, 740 F. Supp.3d 721, 726-27 (C.D. Ill. 2024). Defendant's "fail-safe" argument is based on its mischaracterizations of the class definitions and a curious contention that the classes each "require determining whether

each call was made without prior express consent." (Doc. 50-1 at p. 14). The class definitions, however, do not reference or include consent at all, and are therefore not fail-safe. *See Katz v. CHW Grp., Inc.*, 2023 WL 6445798, at *6-7 (W.D. Ark. Sep. 29, 2023) (rejecting similar attempt to mischaracterize class definitions to read in consent). Defendant cites no case striking class definitions like those at issue here. This is because the definitions are appropriately pled and are based on objective criteria – namely, Defendant's own call logs. *See Hughes*, 740 F. Supp.3d at 726-27 (denying motion to strike a nearly Internal DNC class definition because it was based on objective criteria); *Abboud v. Circle K Stores Inc.*, 731 F. Supp.3d 1094, 1106-09 (D. Ariz. 2024); *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 40 (D. Mass. 2022) (denying motion to strike TCPA class allegations). Notably, the one cases relied on by Defendant in which a TCPA class was stricken, unlike the definitions here, depended on consent. *See Lindsay Transmission, LLC v. Office Depot, Inc.*, 2013 WL 275568, at *4 (E.D. Mo. Jan. 24, 2013) (striking class where class membership included only class members who did not provide "prior consent").

Simply put, Defendant remains able to assert its purported consent defense against any class member and class membership is based on objective criteria in the form of Defendant's records. Thus, resolution of the merits (e.g., whether a class member consented) need not be resolved to define the classes. The class definitions are therefore not fail-safe, and Defendant's fail-safe argument should be denied.

## IV. Conclusion

The Court should thus deny Defendant's motion to dismiss and to strike class allegations.[5]

---

[5] If the Court determines that Plaintiff's complaint is defective in some way, Plaintiff respectfully requests leave to further amend her complaint. Leave to amend should be freely given "where justice so requires." Fed. R. Civ. P. 15(a)(2). This is especially true where a court has not previously identified any deficiencies in Plaintiff's pleadings nor has Defendant previously alleged there were any. *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *10 (D. Minn. Aug. 8, 2019).

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/ Christopher E. Roberts*
Christopher E. Roberts #61895MO
7777 Bonhomme Avenue, Suite 1300
Clayton, MO 63105
Telephone: (314) 863-5700
croberts@butschroberts.com

THE WEITZ FIRM, LLC

*/s/ Max S. Morgan*
Max S. Morgan (admitted pro hac vice)
1515 Market Street #1100
Philadelphia, PA 19102
Telephone: (267) 587-6240
max.morgan@theweitzfirm.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

/s/ *Christopher E. Roberts*